Robert J. DeBRY and Joan DeBry,
Plaintiffs, Appellants, and
Cross–Appellees,

v.

CASCADE ENTERPRISES, a general
partnership, Cascade Construction Company, a general partnership, Del K. Bartel, Lee Bartel, and Dale Thurgood, Defendants, Appellees, and Cross–Appellants.

Nos. 910216, 910284 and 910308.

Supreme Court of Utah.

July 1, 1994.

Rehearing Denied Aug. 18, 1994.

$62,500 on a promissory note and $125,000 in punitive damages for fraudulent acts committed by the DeBrys. The defendants cross-appeal.

## I. FACTS

The plaintiffs purchased an office building constructed by defendant Cascade Construction Company, a general partnership, whose partners are Del Bartel, Dale Thurgood, and Lee Bartel. The building was sold to the plaintiffs by Cascade Enterprises, a general partnership, whose sole partners are Del Bartel and Dale Thurgood. Both partnerships and all the partners were named defendants.

The DeBrys executed an earnest money agreement to purchase the office building while the building was still under construction. The parties closed the sale on December 13, 1986, even though the building was not finished and the parties disagreed about the quality of the workmanship and the cost of additions and changes made to the original building plans.

On December 10, 1985, the parties executed a nonmerger and escrow agreement that provided for the DeBrys to execute a promissory note in the amount of $62,500 in favor of Dale Thurgood and Del Bartel. The note, secured by a trust deed, represented part of the purchase price and was to be placed in escrow. The note stated that it was subject to "that certain Escrow Agreement dated December 10th, 1985." According to the DeBrys, the note was intended to fund a two-year warranty on workmanship and materials by the defendants and "to provide a fund out of which unresolved matters concerning credits, allowances, and extras [could] be resolved." However, a document entitled "Escrow Instructions," also dated December 10, 1985, stated that the note and trust deed were to be held as security to guarantee that the defendants would clear any mechanic's liens recorded against the property. The escrow instructions provided that the note and trust deed would be transferred to the defendants when the lien period expired if no

Edward T. Wells, Wallace R. Bennett, Salt Lake City, for Robert J. DeBry and Joan DeBry.

Del Bartel, Lee Bartel, and Dale Thurgood, pro se.

STEWART, Associate Chief Justice:

Plaintiffs Robert and Joan DeBry appeal from a jury verdict awarding the defendants

liens had been filed on the property. Dale Thurgood and Del Bartel assigned the note and trust deed to Utah Title to be held in escrow. After ninety days, Utah Title returned the original note and deed to the defendants but did not reassign those documents.

Prior to closing, the defendants obtained a temporary thirty-day occupancy permit from Salt Lake County. The permit was issued with the understanding that the building would be completed and brought into compliance with the uniform building code before the temporary permit expired. After closing, the DeBrys discovered that the County had no record of having issued a building permit to the defendants. The County later refused to issue a permanent occupancy permit because the defendants had not obtained a building permit and the building did not comply with the uniform building code. The DeBrys discharged the defendants and hired other contractors to complete the work. Eventually, the County ordered the DeBrys to vacate the building because it was not in compliance with the building code.

The DeBrys sued Cascade Enterprises, Cascade Construction, Thurgood, and Del and Lee Bartel for negligence, breach of warranty, breach of contract, and fraud in constructing the building.[1] Cascade Enterprises, Thurgood, and Del Bartel counterclaimed, alleging that the promissory note held in escrow was due and owing and that the DeBrys had committed fraud against them. The defendants retained counsel to represent them during the first eleven months of the lawsuit. Because it became apparent to the defendants that the litigation would be protracted and prohibitively expensive, they discharged their attorneys. The trial court ruled that Thurgood and Bartel could not represent the partnerships. Thereafter, Thurgood and Del and Lee Bartel represented themselves and their respective partnership interests.

Largely because of the manner in which the DeBrys and their attorneys have litigated this lawsuit, a relatively simple case has been transformed into an unnecessarily protracted and complicated lawsuit. In the four and a half years preceding trial, the DeBrys amended their complaint nine times, changed attorneys several times, caused one judge to be recused and moved twice to disqualify the trial judge who ultimately sat, obtained at least one continuance of the trial date, and filed numerous motions, many of them repetitive. The court file alone now contains twenty-eight volumes with over 13,000 pages.

After a scheduling conference on August 19, 1988, two and a half years after the initial complaint had been filed, the trial court issued a scheduling order directing the DeBrys to "designate their expert witnesses on or before January 2, 1989." On October 12, 1988, the DeBrys filed a supplemental response to the defendants' interrogatories, stating that the DeBrys "had retained [eleven experts] to assist plaintiffs in the litigation." Their answer did not state which, if any, of the listed experts they intended to call as witnesses at trial. The DeBrys did not file any other document before January 2, 1989, that could be construed as a designation of their expert witnesses.

In February 1989, the DeBrys moved to designate as "additional" expert witnesses contractors who had performed emergency repair work on the roof of the building after the January 2 deadline. The motion did not name the additional witnesses or any of the expert witnesses listed in the October supplemental answers to interrogatories. On May 4, 1989, three days after the date set by the court for the completion of discovery, the DeBrys filed a supplemental designation of witnesses, listing for the first time the names of the expert witnesses that they intended to call at trial. The document also requested permission to designate additional witnesses out of time.

In a February 1990 hearing, the trial judge ruled that the DeBrys could not call expert

---

**1.** The DeBrys also sued more than twenty other defendants including their lender, subcontractors, the real estate agent, Salt Lake County, and a county building inspector. This appeal involves only the Cascade partnerships, Thurgood, and the Bartel brothers.

witnesses who had not been designated prior to the January 2, 1989, deadline. Two weeks before trial, counsel for the DeBrys argued to the trial court that they had designated their expert witnesses in the supplemental answers to interrogatories filed in October 1988. The trial court held that the supplemental answers were not a proper designation and that if the DeBrys could not produce a clear written designation of expert witnesses that had been filed at least by the end of February 1989, they could not call their expert witnesses. On the second day of trial, the court again ruled that the DeBrys had not complied with the scheduling order and excluded all of the DeBrys' expert witnesses.

After a thirty-day trial, the jury, by way of jury interrogatories, found that the defendants had breached an implied warranty to construct the building in compliance with the uniform building code and awarded $5,000 to the DeBrys for repairs already made and an additional $47,625 for future repairs, including $30,000 for masonry defects. The jury also found that the defendants negligently failed to comply with the uniform building code in constructing the building. The jury rejected the DeBrys' claim that the defendants committed fraud on the DeBrys.

On the defendants' counterclaims, the jury found that the DeBrys had defaulted on the promissory note and owed the defendants the face amount of the note, plus interest; that the DeBrys hired independent contractors to perform work on the building and maintained that the independent contractors' defective work was the defective work of the defendants; and that the DeBrys conspired to defraud the defendants of payments owed them. In addition, the jury found that the DeBrys' false attribution of responsibility for work defects constituted fraud. The jury awarded the defendants no compensatory damages for fraud but did award them $125,000 in punitive damages.

On this appeal, the DeBrys assert that (1) the defendants could not sue on the promissory note because they did not own it; (2) the jury erred in finding that the DeBrys

committed fraud; (3) the award of punitive damages was erroneous; (4) the trial judge erred in not directing a verdict or granting a judgment notwithstanding the verdict for the DeBrys in the amount of $685,119.20, the amount they asserted was necessary to repair the building and to compensate them for alternate office space; (5) the DeBrys' expert witnesses should have been allowed to testify; (6) the trial judge was biased against the DeBrys and should have been disqualified, and (7) Thurgood and Del Bartel should not have been permitted to represent Cascade Construction and Cascade Enterprises, the partnership defendants.

## II. PROMISSORY NOTE

The DeBrys argue that by assigning the promissory note to Utah Title, Thurgood and Bartel transferred ownership of the note and that in the absence of a reassignment of the note, Thurgood and Bartel had no right to sue on it. The note was given to protect the DeBrys in the event the defendants failed to meet certain obligations. Payment of the promissory note was subject to the terms of "that certain Escrow Agreement dated December 10th, 1985." Because the payment of the note was subject to conditions, it is not a negotiable instrument. Utah Code Ann. § 70A–3–104(1); *Calfo v. D.C. Stewart Co.,* 717 P.2d 697, 699–700 (Utah 1986). Rather, the note is simply a promise by the DeBrys to pay $62,500 upon the defendants' compliance with the conditions set out in the escrow and nonmerger agreement and the escrow instructions.

The assignment of the note must therefore be read in conjunction with the note, the escrow agreement, and the escrow instructions. The escrow instructions stated that once "the lien period has expired and if no liens are recorded or claims made against said property, the Note and Trust Deed will be transferred to the seller [Thurgood and Bartel]." Apparently, no liens were recorded against the property, and Utah Title returned the note and trust deed to the defendants after the lien period expired.

The escrow and nonmerger agreement identified several disputes between the parties regarding the quality of workmanship, charges for extras, and credits to be given the buyers. The agreement provided that the escrow agent

> shall hold the Note and Trust Deed until it receives written instructions signed by Seller and Buyers instructing it to deliver the Note and Trust Deed to a party.... If within one year from the date hereof, the parties have not agreed between themselves concerning how that Note and Trust Deed may be disbursed ... [o]r if no Court or other authority has ruled on how any disputes hereunder are to be resolved, Escrow Agency may bring an interpleader action to determine how the Note and Trust Deed are to be delivered or enforced.

In other words, once all the disputes in the agreement had been resolved, whether by stipulation or court order, Thurgood and Bartel were entitled to payment on the note, subject to any setoffs.

The DeBrys assert that not all the conditions in the nonmerger and escrow agreement have been met. Specifically, they argue that the issues of the masonry and electrical defects are not resolved. That assertion is incorrect. The special verdict form specifically directed the jury to assess what liability, if any, the defendants had to the DeBrys for masonry and electrical defects. The jury found that the defendants were liable for $30,000 for the masonry defects and not liable for any of the electrical defects.[2] All issues set forth in the escrow and nonmerger agreement were therefore resolved by the jury.

In effect, the jury found that all the conditions in the escrow and nonmerger agreement were met and that the DeBrys were therefore liable on the note. That is exactly what the escrow and nonmerger agreement contemplated when it provided that the note and trust deed would be held until either the parties agreed on how to resolve the suit or a "Court or other authority ... ruled on how any disputes hereunder are to be resolved."

Accordingly, we affirm the judgment ordering the DeBrys to pay the note.

## III. FRAUD

The jury found that the DeBrys hired independent contractors to perform work on the building and then sought to charge the defendants for defects caused by the independent contractors and that this conduct was fraudulent and proximately caused damage to the defendants. The DeBrys assert that such conduct does not constitute fraud.

Fraud is "a false representation of an existing material fact made knowingly or recklessly for the purpose of inducing reliance thereon, upon which there was reliance to the innocent party's detriment." *Horton v. Horton*, 695 P.2d 102, 105 (Utah 1984); *Dugan v. Jones*, 615 P.2d 1239, 1246 (Utah 1980); *Schwartz v. Tanner*, 576 P.2d 873, 875 (Utah 1978); *Pace v. Parrish*, 122 Utah 141, 247 P.2d 273, 274–75 (1952). One critical element of the cause of action is actual reliance on a false representation.

Even though the DeBrys were guilty of misrepresentation in charging the defendants with defective work that was done by someone else, that is not actionable fraud. Notwithstanding the imposition on the defendants in having to defend against those claims, the defendants did not rely on those representations to their detriment; indeed, they did all that they could to resist them.

The jury also found that the DeBrys conspired to defraud the defendants of payments due them under the note. The defendants argued that when the DeBrys executed the promissory note, they did not intend to pay it but intended to avoid doing so by filing a lawsuit against the defendants.

The DeBrys argue that there is no cause of action for a conspiracy to defraud.

---

**2.** We hold *infra*, in section IX, that the jury award of $30,000 for masonry defects was improper because the issue of masonry defects had already been settled by stipulation.

They are incorrect. A conspiracy to defraud is fraud committed by two or more persons who share an intent to defraud another. *See, e.g., Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 (Utah 1993); *Schwartz v. Tanner*, 576 P.2d 873, 875 (Utah 1978); *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah Ct.App.1987).

■■■■ Nevertheless, the jury's finding of conspiracy to defraud the defendants of payments due cannot stand. Simple failure to pay a promissory note does not constitute fraud. Furthermore, the verdict cannot be sustained on the ground that the plaintiffs had a fraudulent intent in executing the note, *see Berkeley Bank for Coops. v. Meibos*, 607 P.2d 798, 804–05 (Utah 1980), because the jury found that the DeBrys did not conspire to file a lawsuit before closing on the property.

### IV. PUNITIVE DAMAGES

■■■ A punitive damage award is an additional remedy for the violation of a legal duty giving rise to a cause of action based on that violation. There is no cause of action as such for punitive damages. *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 213 (Colo.1984); *Mathies v. Kittrell*, 354 P.2d 413, 415 (Okla. 1960); *see also* 22 Am.Jur.2d *Damages* § 741 (1988). The award of punitive damages in this case can stand only if the jury's finding that the DeBrys acted fraudulently or conspired to defraud the defendants is valid. Because the defendants did not prove the elements of either an action for fraud or an action for conspiracy to defraud, the punitive damage award cannot stand.

### V. JUDGMENT NOTWITHSTANDING THE VERDICT

The DeBrys assert that the trial court erred in not granting their motion for a directed verdict and a judgment notwithstanding the verdict to award damages in the amount of $685,119.20 for the building defects. The jury awarded $52,625. The DeBrys argue that the jury ignored the only evidence of damages and that the award of $52,625 has no foundation in the evidence.

■■■ A directed verdict and a judgment n.o.v. are justified only if, after looking at the evidence and all reasonable inferences in a light most favorable to the nonmoving party, "the trial court concludes that there is no competent evidence which would support a verdict in his favor." *Gustaveson v. Gregg*, 655 P.2d 693, 695 (Utah 1982); *Hansen v. Stewart*, 761 P.2d 14, 17 (Utah 1988); *Mel Hardman Prods., Inc. v. Robinson*, 604 P.2d 913, 917 (Utah 1979); *Kilpack v. Wignall*, 604 P.2d 462, 463 (Utah 1979); *McCloud v. Baum*, 569 P.2d 1125, 1127 (Utah 1977). A motion should be denied " '[i]f reasonable persons could reach differing conclusions on the issue in controversy.' " *Kilpack*, 604 P.2d at 463 (quoting *McCloud*, 569 P.2d at 1127); *Management Comm. of Graystone Pine Homeowners Ass'n v. Graystone Pines, Inc.*, 652 P.2d 896, 897–98 (Utah 1982).

■■■ Motions for directed verdicts and judgments notwithstanding the verdict are often made *against* a party asserting a cause of action. When entered against a plaintiff, they amount to a determination that the plaintiff has failed to meet the burden of coming forward with sufficient evidence to sustain a jury verdict. Charles A. Wright & Arthur R. Miller, 9 *Federal Practice and Procedure* § 2535 (1971). Although a court must consider whether reasonable minds could differ, regardless of who seeks the directed verdict or judgment n.o.v., the standard is somewhat different when a plaintiff seeks to overturn an unfavorable verdict and to obtain an affirmative judgment.

Here, the plaintiffs seek a judgment notwithstanding the verdict for affirmative relief against the defendants on the ground that the plaintiffs are entitled to all the damages they seek *as a matter of law*. For the Court to rule that the DeBrys were entitled to a judgment n.o.v. in the amount of all the damages they claim, the DeBrys must not only marshal all evidence that supports the verdict; they must also demonstrate that

reasonable persons could not have concluded as the jury did *and* that they were entitled to the full amount of the damages claimed *as a matter of law* and not just damages in some amount. *Hansen,* 761 P.2d at 17–18. Stated in other words:

> "Yet though a motion for directed verdict in favor of the proponent of an issue is cast in the same form as when made by the defending party, it requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding. The ultimate conclusion that there is no genuine issue of fact depends not on a failure to prove at least enough so that the controverted fact can be inferred, but rather depends on making impossible any other equally strong inferences once the fact in issue is at least inferable."

Charles A. Wright & Arthur R. Miller, 9 *Federal Practice and Procedure* § 2535 (1971) (quoting *Mihalchak v. American Dredging Co.,* 266 F.2d 875, 877 (3d Cir. 1959)).

In purporting to marshal the evidence, the DeBrys refer to their own evidence and cite only those facts that support their position. They essentially reargue the evidence as if this appeal were a trial de novo.[3] *See Heinecke v. Department of Commerce,* 810 P.2d 459, 464 (Utah Ct.App.1991); *Horton v. Gem State Mut.,* 794 P.2d 847, 849 (Utah Ct.App.1990).

It is correct that the only testimony on the amount of damages was testimony produced by the DeBrys' witnesses. If that testimony conclusively proved each damage item claimed by the DeBrys, they would be entitled to damages in the amount of $685,119.25. The damages for the claimed items were not, however, liquidated, and the amount of the damages claimed for each item and even some of the items themselves were subject to doubt as to their appropriateness. In some instances, cross-examination of the DeBrys' witnesses demonstrated the arguable nature of their claims.[4] The determinative point is that the jury was not bound under the law to accept the plaintiffs' evidence and award the full amount of damages sought, or even to view that evidence in the light most favorable to the plaintiffs' case. In short, the DeBrys are not entitled to judgment as a matter of law.

3. The DeBrys purport to marshal the evidence in support of the verdict in an appendix to their brief which, together with the pages in the brief, exceeds the page limitation allowed by Rule 24(g) of the Rules of Appellate Procedure. This does not comply with the requirement to marshal evidence. It is improper for counsel to attempt to enlarge the page limit of the brief by placing critical facts in appendices.

4. The DeBrys sought damages for a number of different items, including defects in the masonry, roof and floor, trusses, heating, plumbing, and electrical systems, the parking lot, west stair, architecture, and miscellaneous. Plaintiffs' witness Bill Karren, Jr., testified what he would charge to repair each item.

Although the defendants did not present evidence that challenged the reasonableness of Mr. Karren's estimated costs of repair, they did bring out evidence through direct and cross-examination that cast doubt on whether the DeBrys were entitled to any damages for some of the items. For example, Mr. Karren testified that it would cost $24,200 to fix the heating and air condition-

ing system. However, the subcontractor who installed the system testified that he had made all necessary repairs to the system at no cost. He then testified that the DeBrys had contracted with him to install an improved system but that the existing system complied with the building code. The DeBrys ignored this testimony. The jury could have reasonably determined from this testimony that the DeBrys did not suffer any damage with respect to the heating and air conditioning.

In addition, the defendants put on evidence that the defects in the trusses may have been caused by contractors working on the building after the defendants were ordered off the job. The defendants also introduced testimony that barricades had been moved and that trucks had been driven on the parking lot too soon after the concrete had been laid. The defendants claimed that the protective covering on the concrete was also removed, thus causing the concrete to freeze. Again, the jury could have believed this evidence and decided that the defendants did not cause the defects complained of.

## VI. EXCLUSION OF EXPERT TESTIMONY

■ The DeBrys contend that the trial court abused its discretion in barring four of their expert witnesses from testifying because the Debrys failed to designate them as trial witnesses by the deadline specified by the trial court. The parties were directed to designate their expert trial witnesses by January 2, 1989.

The DeBrys first argue that they in effect complied with the order in their supplemental responses to the defendants' discovery requests filed October 12, 1988, and that those responses put the defendants on notice that the DeBrys intended to call the four expert witnesses they later designated. The argument was rejected by the trial judge, and for good reason.

The DeBrys' supplemental response to interrogatories stated that they had retained eleven experts to assist them in the litigation; the response did not specify any witness who would testify at trial. The purpose of the scheduling order was to save the defendants from having to assume that all eleven witnesses would be called at trial and from incurring the expense of having to prepare for testimony that would not be presented.

A trial court has necessary discretion in managing cases by pretrial scheduling and management conferences. Utah R.Civ.P. 16. A requirement that parties designate their expert witnesses by a certain date before trial allows the parties to prepare for trial by deposing witnesses, planning for effective cross-examination, and obtaining rebuttal testimony. *See Turner v. Nelson,* 872 P.2d 1021, 1023–24 (Utah 1994); Utah R.Civ.P. 16(b); *see also Hardy v. Hardy,* 776 P.2d 917, 925 (Utah Ct.App.1989).

The DeBrys' list of experts who would testify at trial was submitted after the deadline set by the trial court for designating witnesses and even after the discovery cut-off date. The trial court found that the defendants would be prejudiced if the De-Brys' experts were allowed to testify because

the defendants had relied on the deadline set by the court for designating witnesses in planning and carrying out their discovery. The trial court stated that the deadline for designating witnesses and completing discovery was intended to bring a degree of order to a lawsuit that was exceedingly combative and unnecessarily protracted. For the trial court to have ignored the deadline would have compounded that abuse for which the DeBrys were in no small measure responsible.

In sum, the DeBrys had ample notice of the deadline. Not only did they miss that deadline, but they waited until after the discovery cut-off date to designate witnesses. They assert no surprise, no unforeseen circumstances, or any other legitimate excuse for their default. They simply seem to assume that the trial judge had some duty to allow them to violate the discovery orders for any or no reason. Under the circumstances, the trial judge was certainly not beyond the bounds of his discretion.

## VII. JUDICIAL BIAS

■ The Debrys moved twice before trial to have the Honorable Pat Brian disqualified for bias. Both motions were denied. After trial this Court denied a petition by the DeBrys for a writ of mandamus to order Judge Brian to recuse himself from the case. The DeBrys now assert that they should be granted a new trial because Judge Brian was biased against them and should have been disqualified.

The DeBrys do not refer to any specific instance demonstrating bias on the part of Judge Brian. They supported their motions to disqualify with affidavits by a retired Colorado trial judge, a psychologist, and a psychiatrist who asserted that Judge Brian "may be biased, that a reasonable person could reasonably believe that he was biased, and that in one instance he was biased." The opinions in the "experts" affidavits were based on "portions" of the record and/or affidavits of the DeBrys and their attorneys.

■ Whether the transcript shows prejudice in this case is an issue to be decided by

reviewing judges, not by experts purporting to do nothing more than a reviewing judge would do. Affidavits of experts that a judge is or appears to be prejudiced might be appropriate if there is some basis in fact outside the record. But that is not this case. The experts simply submitted an opinion based on what occurred in part of the litigation. Their affidavits add nothing to the transcript.

The DeBrys have not demonstrated from the record how Judge Brian was biased. We reject their claim.

## VIII. LAY REPRESENTATION OF PARTNERSHIP INTERESTS

Approximately a year before trial, the De-Brys moved to disqualify Del Bartel and Dale Thurgood from representing Cascade Enterprises and Cascade Construction on the ground that because those partnerships were not natural persons, Thurgood and Bartel, who are not attorneys, could not represent them. The trial court granted the motion but ruled that Bartel and Thurgood could represent themselves and their respective partnership interests. Notice of the ruling was sent to Lee Bartel, the third partner in Cascade Construction. At trial Thurgood and Del and Lee Bartel represented themselves and their respective partnership interests, and no attorney appeared on behalf of the two partnership entities.

On appeal, the DeBrys argue that the practical effect of the trial court's ruling was that Thurgood and Del Bartel continued to represent themselves and the two partnerships. They assert that this amounted to the unauthorized practice of law and that the appropriate remedy is to set aside any judgment rendered in favor of the partnership.

5. Essentially, the DeBrys raise an issue of the unlawful practice of law by laypersons. Even if we were to assume that this occurred here, it would not necessarily follow that the judgment of the court would be subject to reversal. We leave that issue for another time.

6. The DeBrys have raised two other issues: (1) the trial court's refusal to receive testimony on

 A nonlawyer may not undertake legal representation of a corporate litigant. *Tracy–Burke v. Department of Employment Sec.*, 699 P.2d 687, 688 (Utah 1985); *Tuttle v. Hi–Land Dairyman's Assoc.*, 10 Utah 2d 195, 197–98, 350 P.2d 616, 617–18 (1960). A partner who is not a lawyer may not "act as agent for the partnership and represent the partnership in legal proceedings." *National Bank v. First Wis. Nat'l Bank*, 53 Ill.App.3d 482, 10 Ill.Dec. 633, 639, 368 N.E.2d 119, 125 (1977); *see also Hunt Inv. Co. v. Eliot*, 154 Ariz. 357, 602, 742 P.2d 858, 863 (Ct.App. 1987). Nevertheless, a layperson can represent his own partnership interest. *Hunt*, 154 Ariz. at 602, 742 P.2d at 863.

 Thurgood and the Bartels argue that they represented only themselves as individuals but did not represent the partnership entities. Cascade Enterprises was the seller of the building, and its only partners were Del Bartel and Dale Thurgood. Cascade Construction's only partners were Dale Thurgood, Del Bartel, and Lee Bartel, all of whom appeared at trial. Thurgood and Bartel were the payees on the promissory note on which they sued the DeBrys and were entitled to represent themselves on that issue.

 The DeBrys' claim for defects in the building was asserted against Cascade Enterprises, Cascade Construction, and all the general partners individually. Because all the partners in each partnership were before the court, their individual interests encompassed all interests that the partnership had.[5]

We have reviewed all other issues raised by the DeBrys and find them to be without merit.[6]

## IX. CROSS–APPEAL

The defendants cross-appeal, asserting that (1) the trial court erred in directing a

cost estimates contained in a stipulated masters' report on masonry defects, and (2) the admission of parol evidence that Cascade had obtained a building permit when county records showed otherwise. The first issue is essentially disposed of, *infra*, with the defendants' claims on the cross-appeal. As will be seen, the stipulation pertaining to the masters' report did not contemplate the admission of such testimony and, in

verdict for the DeBrys with respect to masonry defects, (2) the punitive damage award of $125,000 should be tripled because it was intended to be an award for each of the three defendants, and (3) the trial court erred in not designating the defendants as the prevailing parties in this case. Because the punitive damage award cannot stand for the reasons stated above, the defendants' second claim is moot. We address the others in turn.

■ The trial court directed a verdict that masonry defects in the building were produced by the negligence of the defendants. As a result of the directed verdict, the jury awarded the DeBrys $30,000 for the repair of the masonry defects.

The trial court's ruling was based on a special masters' report prepared pursuant to a stipulation by the defendants, the DeBrys, and Tri–K Construction, the subcontractor who performed the masonry work on the building. The stipulation provided that a special masters panel of three licensed civil engineers would "prepare plans and specifications of the repair work necessary to cause the masonry work in the ... building to meet the requirements of the Uniform Building Code" and that "Defendant [Tri–K Construction] will pay all costs associated with bringing the building to the requirements of the Uniform Building Code pursuant to the plans and specifications ... as may be determined by the panel." The stipulation also provided that the masters panel should prepare a written report on the masonry defects and answer the following specific questions:

(a) At the time the original masonry work was carried out and completed, did defendants Cascade, Del Bartel or Dale Thurgood have a valid building permit in existence allowing construction of the masonry work?

(b) At the time the original masonry work was carried out and completed, did the defendants Cascade, Del Bartel or Dale Thurgood have appropriate plans in existence approved by Salt Lake County?

(c) At the time the original masonry work was carried out and completed did defendants Cascade, Del Bartel or Dale Thurgood have a valid contractor's license?

(d) Was the lack of a valid building permit a proximate cause of the existence of the masonry defects?

(e) Was the lack of approved plans a proximate cause of the existence of the masonry defects?

(f) Was the lack of a valid contractor's license a proximate cause of the existence of the masonry defects?

The stipulation specified that "[t]he report of the [masters'] panel shall be considered a Master's Report under Rule 53 [of the Utah Rules of Civil Procedure] and shall be admissible pursuant to the provisions of Rule 53 at the main trial *on consequential damages in this case for all purposes contemplated by Rule 53 of the Utah Rules of Civil Procedure."* (Emphasis added.) The stipulation also stated, "With respect to the ... panel's report *all parties to the stipulation,* namely Del Bartel, Dale Thurgood, Cascade Enterprises, Cascade Construction, Tri–K Construction, Sherwin Knudsen and plaintiffs *shall be bound by the findings therein."* (Emphasis added.) The stipulation did not provide that Cascade, Thurgood, or the Bartels would be responsible for repairing masonry defects or for paying for those repairs.

fact, disposed of the issue of the defendants' liability with respect to the masonry defects by requiring the masonry subcontractor to make those repairs and the subcontractor agreed to make all necessary repairs to the masonry. The masters' estimate of the cost of repairs was irrelevant. Furthermore, the cost estimate was introduced into evidence through other testimony.

The second issue is also irrelevant to the DeBrys' claims. The purpose of showing that the defendants did not have a valid building permit was to prove that the defendants violated the building code. Although the jury found that the defendants did obtain a building permit, it found that the defendants breached an implied warranty by violating the building code in other respects. Thus, whether the defendants had a building permit is irrelevant to final outcome of this case.

The defendants argue that because the masters' report could be used only to show consequential damages, the trial court erred in using the findings in the report to direct a verdict on the issue of the defendants' negligence. The defendants also contend that they could not be held liable for repairing the masonry defects because the stipulation provided that Tri–K Construction would be responsible for making those repairs. We agree.

The stipulation imposed the responsibility for making the masonry repairs squarely on Tri–K Construction and provided that the special masters' report would be admissible at trial only for determining consequential damages against the defendants. The jury awarded no consequential damages to the DeBrys but found that the cost of repairing the masonry was $30,000 and awarded that to the DeBrys. Because the parties resolved the issue of liability for that item, the judgment against the defendants must be reduced by $30,000.[7]

Finally, the defendants argue that they are entitled to their costs and fees because they were the prevailing party. The defendants do not claim, however, that they raised this issue below, and we have found no indication that they did so. We decline to rule on the issue.

We have reviewed the other issues raised in the defendants' cross-appeal and find them to be without merit.

### X. CONCLUSION

The judgment for the DeBrys in the amount of $52,625 for defects in the building is reduced by $30,000; the judgment for the defendants on the note for $62,500 plus interest is affirmed; and the judgment against the DeBrys for punitive damages in the amount of $125,000 is vacated.

ZIMMERMAN, C.J., HOWE and DURHAM, JJ., and LEONARD H. RUSSON, Court of Appeals Judge, concur.

HALL, J., did not participate herein; LEONARD H. RUSSON, Court of Appeals Judge, sat prior to his appointment to this court.

---

7. The defendants also argue that the trial court erred in permitting Kenneth Karren, Jr., one of the engineers on the masters panel, to testify, but they do not state why. Accordingly, we are unable to rule on the defendants' point.